## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| **MILAGROS RODRIGUEZ,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **CIVIL ACTION FILE NO.** |
| | ) | _____ |
| **v.** | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| **GREYSTAR MANAGEMENT** | ) | |
| **SERVICES, L.P.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## COMPLAINT FOR DAMAGES

COMES NOW Plaintiff MILAGROS RODRIGUEZ ("Plaintiff" or "Rodriguez") and, by and through the undersigned counsel of record, hereby files this Complaint for Damages against Defendant, **GREYSTAR MANAGEMENT SERVICES, L.P.,** ("Defendant" or "Greystar"), respectfully showing the Court as follows:

## JURISDICTION AND VENUE

1.

This is an action pursuant to: (1) Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000(e) *et seq.*, for discrimination based on sex, race national origin and retaliation; (2) 42 U.S.C. § 1981 ("Section 1981") for discrimination based on race in violation of the Fourteenth Amendment; and (3) state law claims of negligent hiring, retention, and supervision as well as intentional

infliction of emotional distress.

2.

This Court has original jurisdiction over Plaintiff's Title VII and Section 1981, pursuant to 28 U.S.C. § 1331.

3.

Venue in this district and division is proper under 28 U.S.C. § 1391 as Defendant is located in the Northern District of Georgia, Atlanta Division, and all of the acts and omissions giving rise to this action occurred in this district and division.

4.

This Court has Supplemental Jurisdiction over pendant state law claims under 28 U.S.C. § 1367 because said claims arise from the same nucleus of operative facts as the federal claims which form the basis of the Complaint.

5.

Plaintiff satisfied all administrative prerequisites to institute this action. Specifically, Plaintiff timely filed her charge of discrimination ("Charge") with the Equal Employment Opportunity Commission ("EEOC")—Charge No. 410-2022-00573. Thereafter, Plaintiff received the Notice of Right to Sue from the EEOC and Plaintiff has brought this suit within ninety (90) days of receipt of such notice.

**PARTIES**

6.

Plaintiff is a female of Hispanic and Latin origin, race, background and a resident of the United States. Plaintiff is a resident of the Northern District of Georgia, Gwinnett County, and is subject to this Court's jurisdiction.

7.

At all times relevant to this action, Plaintiff was an employee of Defendant Greystar within the meaning of Title VII, 42 U.S.C. § 2000e (f).

8.

Defendant Greystar is a South Carolina Limited Partnership organized in the State of South Carolina. Greystar is a foreign business registered to transact business in the State of Georgia.

9.

Greystar maintains multiple offices in Georgia, two of which are located in the City of Atlanta, Fulton County.  Defendant may be served with process through their registered agent, C T Corporation System, 289 S Culver St, Lawrenceville, GA, 30046-4805.

10.

Defendant Greystar is an employer within the meaning of Title VII, 42 U.S.C. § 2000e(b).

## STATEMENT OF FACTS

11.

Greystar is a property management company that provides its services to multi-family properties and residential apartment complexes.

12.

Plaintiff, a Mexican-American female, began her employment with Greystar on August 14, 2020 as a Leasing Professional at Greystar's 32 Hundred Lenox Building located at 3200 Lenox Rd NE, Atlanta, GA 30324.

13.

During her tenure at Greystar, Plaintiff worked at four additional locations, namely: The Commons at Briarwood Park, located at 3510 Buford Hwy NE, Atlanta, GA 30329 ("The Commons"); Notting Hill, located at 350 Perimeter Center N, Atlanta, GA 30346 ("Notting Hill");  Avana Lenox, 925 Canterbury Rd NE, Atlanta, GA 30324("Avana Lenox"); and Avana Cheshire Bridge, 2124 Cheshire Bridge Rd NE, Atlanta, GA 30324 ("Avana Cheshire").

14.

In her position as a Leasing Professional, Plaintiff was tasked with opening and closing the office; organizing showings for potential tenants of the amenities and units; following up with leads and; completing move-in tasks and paperwork; and general administrative tasks.

15.

While working at Greystar, Plaintiff was a tenant at 32 Hundred Lenox and later

at Avana Lenox.

16.

When Plaintiff initially began working for Defendant, Plaintiff was excited about her new position which allowed her to work at the apartment complex where she resided.

17.

Unfortunately, Plaintiff's excitement was short lived due to the discriminatory, harassing and sexually charged comments directed toward Plaintiff due to her status as a Hispanic homosexual female.

18.

Albert Robinson ("Robinson"), a non-Hispanic heterosexual male, and Plaintiff's direct report began a campaign of discrimination and harassment against Plaintiff, in or around November 2020.

19.

By way of example, Robinson was aware that Plaintiff was in a same sex relationship.  When Plaintiff was seen working or communicating with her female co-worker, Stephanie Zavala ("Zavala"), Robinson often interrupted the two to make inappropriate comments about Plaintiff's sexual orientation.

20.

During his interruptions, Robinson would often accuse Plaintiff and Zavala of

flirting and insisted that they were in a sexual relationship.  For example, when Plaintiff was assisting Zavala with a lease agreement, Robinson interrupted the two to scold Plaintiff by saying "Leave Stephanie alone, let her work."  Robinson's comment was made to insinuate that the two were flirting with each other instead of working.

21.

Similarly, when Plaintiff and Zavala were simultaneously assigned to off-site projects, Robinson would make comments about Plaintiff and Zavala "going off together" to other employees.  These statements were made to insinuate that Plaintiff and Zavala were engaging in sexual acts, rather than working.  The fact that Plaintiff and Zavala, though both off-site, were often at different locations did not deter Robinson from making these incendiary comments about the two.

22.

Robinson also encouraged other male employees to participate in lodging these harassing and derogatory remarks against Plaintiff.

23.

Plaintiff's male heterosexual co-workers were not forbidden from working together or subjected to sexually inappropriate insinuations when working together.

24.

Reginald Gittens ("Gittens"), a non-Hispanic heterosexual male, who worked as

a Service Supervisor and a superior to Plaintiff, engaged in similar harassing and discriminatory conduct toward Plaintiff.

25.

In January 2021, after overhearing Plaintiff on the phone with her girlfriend on a work-related call, Gittens inappropriately asked Plaintiff if she was single or in a relationship.

26.

Plaintiff confirmed that she was in a relationship with her girlfriend, but objected to him prying into her personal relationships.

27.

After she responded, Gittens hurled several discriminatory and sexually charged comments at Plaintiff.

28.

Gittens began asking Plaintiff about her sex life with her girlfriend by lodging a barrage of sexually charged questions, such as "How does that even work? How do you have sex without a dick?"

29.

Plaintiff, understandably appalled and embarrassed, vehemently objected to these sexually charged and harassing comments made by Gittens, but he refused to stop.

30.

Both, Robinson and Gittens, were very vocal about discriminatory animus for same sex relationships.

31.

On several occasions, Gittens told Plaintiff that it was wrong for her to be involved in a same sex marriage.  Gittens further expressed his disgust to Plaintiff about the fact that same sex relationships were legal.

32.

Gittens went on to tell Plaintiff that she would not like sex until she had sex with "a man from Africa" where he was from.

33.

Plaintiff continuously objected to these comments and demanded that Robinson and Gittens stop, but Plaintiff's demands were ignored, and the discriminatory and sexually harassing conduct continued daily.

34.

One day, in or around February 2021, Plaintiff called in to let her job know that she was running a few minutes late.

35.

When Plaintiff arrived at work, her co-worker - Paul Santi ("Santi"), a non-Hispanic heterosexual male, became visibly angry and charged at Plaintiff while calling her a "cunt ass bitch."  Plaintiff, in fear that Santi was going to physically

attack her, tossed her coffee at him to stop him from continuing to approach her.

36.

Santi felt comfortable referring to Plaintiff as a "cunt ass bitch" due to the culture that Robinson and Gittens created by openly discriminating against Plaintiff based on her status as a homosexual Hispanic female. Even worse, Robinson and Gittens encouraged others, like Santi, to do the same.

37.

The incident between Plaintiff and Santi was reported to Gabriel Boykin-Willis ("Boykin-Willis"), a non-Hispanic homosexual male, who served as the Community Manager for the Defendant.

38.

Despite the fact that the incident was reported to Boykin-Willis, no substantial steps were taken to remedy the discrimination that Plaintiff faced daily at work.

39.

On the same day after the Santi made his discriminatory comments toward Plaintiff, Gittens continued to pile on sexually harassing and discriminatory comments at Plaintiff. Plaintiff demanded that he stop, to no avail.

40.

By way of example, when Gittens observed Plaintiff conversing with her co-worker, Victoria Rodriguez, a homosexual Hispanic, he expanded his discriminatory

comments to include Plaintiff's race and national/origin by demanding that the two "speak English, [because they] are in America."

41.

 Gittens, again, was very vocal about his discriminatory animus, this time, toward Mexican-Americans.  He followed up his demands to Plaintiff and Victoria Rodriguez by expressing his belief that Mexicans were dirty and lazy.

42.

Plaintiff objected to these discriminatory comments made by Gittens. Her demands for him to stop were ignored, as always.

43.

In or about, March 2021, Plaintiff observed an escalating confrontation between two residents.

44.

Plaintiff contacted law enforcement and documented the altercation by making a video recording of the incident.

45.

Gittens was on duty that day and asked Plaintiff to fill him in on the details of the altercation that she observed.

46.

Plaintiff explained what she observed and gave Gittens her cell phone so that

he could view the video that she recorded.

47.

When Plaintiff handed Gittens her phone it was playing the video that she had just taken of the altercation.

48.

While Gittens was viewing the video on Plaintiff's phone, Plaintiff was called away by an officer who had responded the altercation.

49.

Plaintiff's phone remained in Gittens' possession while she spoke with the police.

50.

When Plaintiff returned to retrieve her phone from Gittens, she discovered that Gittens had snooped through personal videos and was watching a private video of Plaintiff and her girlfriend engaging in sexual acts.

51.

Plaintiff was horrified that Gittens had violated her trust and viewed private videos on her phone without her consent.

52.

The following day, Plaintiff's non-Hispanic heterosexual co-worker, Steven, approached her and stated that she should make sure that she does not accidently

show him (Steven) the wrong video on her phone. Steven further informed Plaintiff that Gittens had informed him of the private content that he saw on Plaintiff's phone the day before.

53.

Throughout her tenure at Greystar, Plaintiff objected to the sexually charged and racially discriminatory comments and conduct lodged at her.

54.

Plaintiff was subject to severe and pervasive racial discrimination and sexual harassment on a daily basis, based on her status as a homosexual Hispanic female.

55.

Plaintiff's objections and demands for the discriminatory conduct to cease were always ignored.

56.

In or about March 2021, Plaintiff attempted to escalate her complaints by having a more formal conversation with Robinson.

57.

Unfortunately, in response to Plaintiff's complaints, Robinson laughed at Plaintiff and stated "sometimes when people go through traumatic experiences, they make things up."

58.

Robinson's response and statements to Plaintiff about her 'traumatic experiences' was in reference to the fact that Plaintiff was in therapy as a result of being a victim of rape.

59.

Robinson knew that Plaintiff's rape was an extremely traumatic experience and chose to use it to undermine her valid complaints of the ongoing discriminatory harassment she was experiencing due to her supervisors discriminatory animus toward her status as a homosexual Hispanic female.

60.

Robinson's decision to laugh at Plaintiff and mock her status as a rape victim was done solely with the intent to cause Plaintiff severe emotional distress and avoid changing the culture of Greystar.

61.

After being rebuffed by Robinson, Plaintiff contacted Boykin-Willis to again demand that the sexual harassment and race discrimination stop.

62.

Similar to Robinson, Boykin-Willis failed to take Plaintiff's claims seriously and responded by asking Plaintiff why she keeps "putting herself in situations" to be sexually harassed and discriminated against based on her race and national origin.

63.

During this same occasion, in addition to blaming Plaintiff for the sexual harassment and race discrimination that she was regularly experiencing at work, Boykin-Willis recruited Robinson to follow Plaintiff home.

64.

After Plaintiff entered her apartment, Boykin-Willis and Robinson stood outside her apartment to make sexually charged and racially discriminatory comments about the Plaintiff. They made sure to speak loud enough for the Plaintiff to hear while inside her apartment.

65.

In yet another attempt to escalate her claims, Plaintiff complained to Jo Fusco ("Fusco"), a non-Hispanic heterosexual male, who served as a Manager of Operations for the Defendant, in or around March 2021.

66.

After hearing Plaintiff's complaints about the ongoing severe and pervasive racial discrimination, sexual harassment and now retaliatory actions of Boykin-Willis and Robinson, Fusco opted to relocate Plaintiff instead of addressing the inappropriate conduct and discriminatory culture of Defendant.

67.

Plaintiff's complaints of the racial discrimination, sexual harassment and retaliatory conduct were also relayed to Amy Parkison ("Parkison"), who worked in

Human Resources for the Defendant.

68.

As a result of Plaintiff engaging in protected activity under Title VII by reporting the ongoing severe and pervasive racial discrimination, sexual harassment and retaliation that she was experiencing at work, Plaintiff was transferred to from 32Hundred Lenox to The Commons.

69.

Upon arriving at The Commons to start work, Plaintiff met with Bryce Shew ("Shew"), a non-Hispanic homosexual male, who served as a Managing Director for the Defendant.

70.

Plaintiff, understandably, not wanting a repeat of the environment that she experienced at 32Hundred Lenox, spoke to Shew about the incendiary comments, sexually harassment and retaliation that she experienced while working at 32Hundred Lenox.

71.

Shew informed Plaintiff that he was not aware of Plaintiff's prior complaints of sexual harassment, race discrimination and retaliation.  He further informed Plaintiff, that he had only heard that she threw coffee at a co-worker.

72.

Unfortunately, after Plaintiff informed Shew of her prior experience, Shew responded by subjecting Plaintiff to increase scrutiny and blamed her experience of being sexually harassed on her own actions.

73.

By way of example, Shew directed Plaintiff's co-worker, Oscar, to tell Plaintiff that she could not wear a dress that she had on because he wanted to avoid more complaints of sexual harassment and discrimination by Plaintiff.

74.

After the negative response from Shew, Plaintiff informed Kitty Koehler ("Koehler"), the then Community Manager for the Defendant, of the sexual harassment, race discrimination and retaliation that she had experienced at 32Hundred Lenox.

75.

After Plaintiff's discussion with Koehler, Shew organized a meeting with Plaintiff, Koehler, and "Stephanie,[1]" who worked for Defendant as a Regional Manager.

76.

Shew used the meeting to berate Plaintiff by yelling at her and calling her a liar. Shew specifically stated that Plaintiff was lying about the sexual harassment, race

---

[1] This individual is not Stephanie Zavala.

discrimination and retaliation that she suffered while working for the Defendant.

77.

Plaintiff, who was not expecting to be verbally attacked during the meeting, became overwhelmed and began to become visibly emotional.

78.

At the conclusion of the meeting, Shew informed Plaintiff that she was banned from mentioning her concerns of sexual harassment if she wanted to stay employed at the Defendant.

79.

The condition forbidding Plaintiff to discuss sexual harassment or other forms of discrimination experienced at her job, is in direct violation of her rights afforded under Title VII and other federal law.

80.

Shortly after the meeting with Shew, Plaintiff and Koehler had a subsequent meeting.  During the meeting, Koehler agreed that Shew's actions during the prior meeting were inappropriate.

81.

Although Koehler acknowledged that Shew's actions were inappropriate, no actions were taken by the Defendant to address the sexual harassment, race discrimination and retaliation that Plaintiff continued to experience while working

for the Defendant.

82.

Sometime thereafter, Plaintiff received an offer for a position at another Greystar property.  However, the transfer required approval from Shew.

83.

Plaintiff informed Shew that she wanted to transfer and he refused to approve the transfer.

84.

Instead of approving her transfer, Shew issued a 'final warning' to Plaintiff for supposedly "spreading rumors" about the sexual harassment, race discrimination and retaliation she experienced.  Following the 'final warning,' Plaintiff was asked to leave work.

85.

Shew's final warning was completely unjustified and included untrue accusations about Plaintiff's performance and alleged failures to comply with Defendant's company policies.

86.

Even worse, it is clear that Shew withheld his approval and issued a formal warning to Plaintiff, as a form of retaliation against Plaintiff for discussing the sexual harassment, race discrimination and retaliation that Plaintiff experienced.

87.

Sometime thereafter, Plaintiff received a second offer for a position at another Greystar property.  This request was also denied by Shew.  Unsurprisingly, no reason was provided for the denial, despite her multiple requests for an explanation.

88.

The process of transferring from one of Defendant's properties to another after being extended an offer has always been seamless.  The resistance that Plaintiff was receiving to her request to transfer was a form of retaliation.

89.

In hopes of facilitating a transfer to another property, Plaintiff contacted Amy Parkison ("Parkison"), who worked in the Human Resources Department, by email. Parkison failed to respond to Plaintiff's email.

90.

In or about April 2021, Plaintiff contacted Mario, from the Human Resources Department and expressed her desire to transfer and the unique trouble she was experiencing based on Shew's failure to approve the transfer.

91.

Mario forwarded Plaintiff's concerns to Parkison.  Parkinson responded to Plaintiff flippantly by stating, "Do you want to tell me what is going on, and why you are mad that [Shew] is bringing these issues up when you told people?"

92.

Parkison's comments were problematic for two reasons. First, it clearly misrepresented Plaintiff's complaints of the ongoing sexual harassment and racial discrimination that she was subjected to at work. Second, it was clear that Parkinson sought to investigate Plaintiff rather than the complaints described above.

93.

After receiving Parkison's response, Plaintiff requested to work with a different Human Resources representative.

94.

Plaintiff contacted Jo Fusco ("Fusco"), a white heterosexual female, for a new assignment. Plaintiff's request to Fusco went unanswered for two weeks. After which, Fusco informed Plaintiff that they needed to discuss some issues.

95.

During the meeting with Fusco, Plaintiff was informed that her commissions would be split with other employees – which was not standard policy or procedure. No information was provided by Fusco as to why Plaintiff's salary would suddenly be significantly reduced and disbursed among other employees.

96.

As a result of the continued sexual harassment, discrimination, and retaliation, Plaintiff was constructively fired, as so was left with no choice, but to resign.

## **CLAIMS FOR RELIEF**

### **COUNT I**
### **SEX DISCRIMINATION**
### **IN VIOLATION OF TITLE VII**

97.

Plaintiff re-alleges and incorporates by reference each of the foregoing paragraphs as if fully restated herein.

98.

At all times relevant to this action, the relationship between Plaintiff and Greystar was a relationship of "employee" to "employer," such that a cause of action exists where discrimination based on sex is alleged to be the cause of an adverse action directed to the employee by the employer.

99.

At all times relevant to this action, Greystar acted by and through its agents and employees, each of whom acted in the course and scope of their employment with and for Greystar.

100.

At all times relevant to this action, Robinson, Gittens, Boykin-Willis and Parkison were employees of Greystar. Each of these managers, individually and collectively had the authority to undertake and recommend tangible employment actions against Plaintiff.

101.

At all times relevant Plaintiff was a homosexual female employee of Greystar and is a member of a protected class under Title VII.

102.

Defendant intentionally subjected Plaintiff to a hostile work environment with its severe and pervasive treatment of her based on her status as a homosexual femal. The Defendant's workplace was permeated with discriminatory intimidation, harassment, ridicule, and insult that was sufficiently severe or pervasive to alter the conditions of Plaintiff's employment and create an abusive working environment.

103.

Defendant's discriminatory treatment of Plaintiff included statements by Gittens, such as "how does that even work? How do you have sex without a dick?" and referring to Plaintiff as a "cunt ass bitch."  Similarly, statements from Robinson accusing Plaintiff and her co-worker, of flirting, rather than working were discriminatory.

104.

Defendant maintained a discriminatory policy to not allow Plaintiff and her co-worker Zavala to work together, due to their status as homosexual females.

105.

In engaging in these actions, Defendant acted with an intentionally discriminatory motive.

106.

Plaintiff was treated less favorably than others outside her protected class.

107.

As a proximate and direct result of Defendants' conduct, Plaintiff has suffered, and will continue to suffer, damages including emotional distress, inconveniences, loss of income and benefits.

108.

Consequently, Plaintiff is entitled to an award of back pay and benefits, injunctive relief, attorneys' fees, and all other appropriate damages, remedies, and other relief available under Title VII and all federal statutes providing remedies for violations of the Title VII.

## COUNT II
## NATIONAL ORIGIN DISCRIMINATION
## IN VIOLATION OF TITLE VII

109.

Plaintiff re-alleges and incorporates by reference each of the foregoing paragraphs as if fully restated herein.

110.

Plaintiff is Mexican; therefore, she belongs to a protected class under Title VII.

111.

Defendant intentionally subjected Plaintiff to a hostile work environment with its severe and pervasive treatment of her based on her national origin. The Defendant's workplace was permeated with discriminatory intimidation, harassment, ridicule, and insult that was sufficiently severe or pervasive to alter the conditions of Plaintiff's employment and create an abusive working environment.

112.

Defendant's discriminatory treatment of Plaintiff included statements that Mexicans, like Plaintiff, are dirty and lazy.

113.

Plaintiff was treated less favorably than others outside her protected class.

114.

As a proximate and direct result of Defendants' conduct, Plaintiff has suffered, and will continue to suffer, damages including emotional distress, inconveniences, loss of income and benefits.

115.

Consequently, Plaintiff is entitled to an award of back pay and benefits, injunctive

relief, attorneys' fees, and all other appropriate damages, remedies, and other relief available under Title VII and all federal statutes providing remedies for violations of the Title VII.

**COUNT III**
**RACE DISCRIMINATION**
**IN VIOLATION OF TITLE VII AND 1981**

116.

Plaintiff re-alleges and incorporates by reference each of the foregoing paragraphs as if fully restated herein.

117.

Plaintiff is Hispanic; therefore, she belongs to a protected class under Title VII.

118.

Defendant intentionally subjected Plaintiff to a hostile work environment with its severe and pervasive treatment of her based on her national origin. The Defendant's workplace was permeated with discriminatory intimidation, harassment, ridicule, and insult that was sufficiently severe or pervasive to alter the conditions of Plaintiff's employment and create an abusive working environment.

119.

Defendant's discriminatory treatment of Plaintiff included an unofficial company policy forbidding Plaintiff from speaking Spanish at work.

120.

Plaintiff was treated less favorably than others outside her protected class.

121.

As a proximate and direct result of Defendant's conduct, Plaintiff has suffered, and will continue to suffer, damages including emotional distress, inconveniences, loss of income and benefits.

122.

Consequently, Plaintiff is entitled to an award of back pay and benefits, injunctive relief, attorneys' fees, and all other appropriate damages, remedies, and other relief available under Title VII and all federal statutes providing remedies for violations of the Title VII.

## COUNT IV
## RETALIATION
## IN VIOLATION OF TITLE VII

123.

Plaintiff re-alleges and incorporates by reference each of the foregoing paragraphs as if fully restated herein.

124.

The unlawful retaliation to which Plaintiff was subjected by Defendant was in violation of 42 U.S.C. § 2000e et seq., thus entitling her to all appropriate relief provided under the statute.

125.

Defendant retaliated against Plaintiff when Boykins-Willis and Robinson stood outside of Plaintiff's apartment to make sexually charged and racially discriminatory comments about Plaintiff, after she complained to each of them of the discrimination that she faced at work.

126.

Defendant retaliated against Plaintiff when Shew told her that she was no longer allowed to speak about the sexual harassment and racial discrimination that she faced while working for the Defendant.

127.

Defendant retaliated against Plaintiff when Shew failed to approve her transfer after she was extended two separate offers to other properties.

128.

Defendant retaliated against Plaintiff when suddenly and without reason was informed that she would no longer receive her full commission, thereby substantially reducing her salary.

129.

Plaintiff was treated less favorably than others outside her protected class.

130.

As a proximate and direct result of Defendant's conduct, Plaintiff has suffered, and will continue to suffer, damages including emotional distress, inconveniences,

loss of income and benefits.

131.

Consequently, Plaintiff is entitled to an award of back pay and benefits, injunctive relief, attorneys' fees, and all other appropriate damages, remedies, and other relief available under Title VII and all federal statutes providing remedies for violations of the Title VII.

**COUNT V**
**STATE LAW – NEGLIGENT HIRING, RETENTION, AND SUPERVISION**

132.

Plaintiff re-alleges and incorporates by reference each of the foregoing paragraphs as if fully restated herein.

133.

Defendant knew, or in the exercise of ordinary diligence, should have known of the propensity of its employees to engage in discriminatory conduct towards homosexual Hispanic females of Mexican descent.

134.

Defendant owed a duty to Plaintiff to hire, retain, and supervise an employee who would lawfully conduct themselves and not engaged in discriminatory and tortious conduct.

135.

Defendant breached the aforementioned duty by negligently retaining and supervising Robinson, Gittens, and Shew. In addition, Defendant ratified, condoned, and/or adopted their conduct by inaction.

136.

Defendant Fulton County's negligent supervision and continued retention of Plaintiff proximately caused Plaintiff's damages for which she is entitled to recover as provided by law.

## COUNT VI
## STATE LAW – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

137.

Plaintiff re-alleges and incorporates by reference each of the foregoing paragraphs as if fully restated herein.

138.

Defendant's conduct towards Plaintiff mentioned herein was intentional and/or reckless, extreme and outrageous, and caused Plaintiff severe shame, humiliation, embarrassment and emotional distress of a nature that no reasonable person can endure.

139.

Defendant knew or should have known that such conduct would result in severe emotional distress to Plaintiff.

140.

As a result of Defendant's conduct, Plaintiff has and will continue to suffer damages for which she is entitled to recover as provided by law.

## COUNT VII
## ATTORNEY FEES

141.

Plaintiff re-alleges and incorporates by reference each of the foregoing paragraphs as if fully restated herein.

142.

Plaintiff is entitled to an award of attorney's fees and expenses of litigation on each and every cause of action alleged herein, as provided by statute and because Defendant has acted in bad faith, been stubbornly litigious, and caused Plaintiff unnecessary trouble and expense.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully requests that this Court:

1) Grant Plaintiff a trial by jury as to all triable issues of fact;

2) Grant declaratory judgment that Plaintiff's rights under Title VII, Section 1981, and the Equal Protection Clause were violated;

3) Award compensatory damages in an amount to be determined by a jury;

4) Award appropriate back pay, including, but not limited to, reimbursement for lost income, bonuses, incentive compensation, pension, social security, and

other benefits to which Plaintiff would have been entitled to but for Defendant's unlawful retaliation and discrimination based on Plaintiff's sex, sexual orientation, race and national origin;

5) Award prejudgment interest on any award of back pay made by the jury as required by law;

6) Award liquidated damages equal to back pay and lost benefits based upon Defendant's willful violations;

7) Award punitive damages in an amount reasonable and commensurate with the harm done and calculated to be sufficient to deter such conduct in the future;

8) Award Plaintiff's attorneys' fees, costs, and disbursements; and

9) Award Plaintiff's such further and additional relief as may be just and appropriate.

Respectfully submitted this 9th day of June, 2022.

**WATSON LAW LLC**

By:     **/s/ A. Zakiya Watson-Caffe**
A. Zakiya Watson-Caffe
Georgia Bar No. 441773
800 Kennesaw Avenue NW, Ste. 220
Marietta, Georgia 30060
Telephone: (404) 600-1771
Email: zak@zwatsonlaw.com

*Counsel for Plaintiff*

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 5.1

The undersigned hereby certifies that the foregoing document has been prepared in accordance with the font type and margin requirements of Local Rule 5.1 in the Northern District of Georgia, using a font type of Times New Roman and a point size of 14.

By: **/s/ A. Zakiya Watson-Caffe**
A. Zakiya Watson-Caffe
Georgia Bar No. 441773
